United States District Court
Southern District of Texas

**ENTERED**
July 30, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| F.H. BERTLING PTE LTD., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:22-CV-03488 |
| | § | |
| QATAR AIRWAYS Q.C.S.C., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Pending before this Court is Plaintiff F.H. Bertling PTE Ltd.'s ("Bertling") Motion for Partial Summary Judgment (Doc. No. 50). Defendant Qatar Airways Q.C.S.C. ("Qatar Airways") filed a response, (Doc. No. 59-1), and Bertling replied. (Doc. No. 67). After a close review of the filings, admissible summary judgment evidence, and the relevant legal standards, this Court hereby **GRANTS-IN-PART AND DENIES-IN-PART** Bertling's Motion for Partial Summary Judgment (Doc. No. 50).

### I.    Factual Background

As this Court has previously set out, *see* (Doc. No. 76), this case arises from an attempted intercontinental freight shipment from Houston, Texas to Changi, Singapore. (Doc. No. 11) (First Amended Complaint). Bertling is a freight forwarding company organized under the laws of Singapore and with its principal place of business there. (*Id.*). Bertling contracted with Air Charter Service (HK) Ltd. ("ACS") to arrange an aircraft to transport about 100,000 kilograms of cargo from Houston to Singapore. *See* (Doc. No. 50-2). That written contract (the "Bertling–ACS Contract") laid out several terms and conditions that are relevant to this dispute. First, the Bertling–

ACS Contract required that the cargo had to be "customs cleared and ready for carriage 24 hours prior to the scheduled departure," which was set for May 4, 2022, at 9:40 AM Central Standard Time. (*Id.* at 4). Second, the Bertling–ACS Contract required Bertling to "deliver the Cargo to the departure airport [IAH] . . . properly packaged to the satisfaction of the Carrier [Qatar Airways] within the time frame specified in the Schedule," which was 24 hours before scheduled departure. (*Id.* at 5) (§ 4.1); *see also* (*id.* at 7) (§ 6.3) ("[Bertling] shall ensure that any Cargo is available and ready for loading onto the Aircraft at the place and time and date specified in the Schedule . . . ."). Third, the Bertling–ACS Contract stated that Bertling "is responsible for the Cargo [on] either side of the Flight, [and] for the avoidance of doubt, this means that the Cargo is customs cleared and security screened (if necessary) . . . ." (*Id.*) (§ 6.3).

After executing the Bertling–ACS Contract, ACS then contracted with Qatar to charter its aircraft to transport Bertling's cargo to satisfy its obligations under the Bertling–ACS Contract. (*Id.* at 13). Under the agreement with Qatar (the "ACS–Qatar Contract"), ACS agreed that "it enter[ed] into the Contract both as principal on its own behalf and a*s **agent for all persons and owners of the goods and cargo carried under the Charter***, each of whom shall be bound by these Conditions." (*Id.* at 20) (§ 17.3). Like the Bertling–ACS Contract, the ACS–Qatar Contract required the "Cargo [to] be ready loading twenty-four (24) hours before scheduled time of departure." (*Id.* at 13) ("Reporting Time"). The ACS–Qatar Contract also put the burden of clearing customs on Bertling and ACS, stating that the Charterer "undertakes, represents, and warrants that" "[a]ll subcontractors, agents, Passengers and other parties having or claiming any interest in the carriage under the Charter . . . shall comply with all customs and all other formalities, applicable laws, and regulations in relation thereto . . ." (*Id.* at 18) (§ 13.1). The ACS–Qatar Contract also states:

2

If due to refusal, cancellation, or late granting of any authorisation, clearance, or permit required for the performance of the Programme, *or for unforeseen Aircraft failures, crew limitations, safety or security concerns*, or if due to any other cause beyond the control of Qatar Airways, *Qatar Airways is unable within a reasonable time to perform the Programme, then Qatar Airways may, at its absolute discretion, but without obligation, immediately suspend or terminate the Contract* upon notice to the Charterer. *In the event of termination or suspension of the Contract in accordance with the foregoing*, no penalty shall be due or payable by either Party and *both Parties will be absolved of all liabilities for any and all losses suffered therefrom and any payments of deposits or Charter Price made by or on behalf of the Charterer to Qatar Airways will be refunded to the Charterer* within a reasonable period of time . . . .

(*Id.* at 17) (§ 7.1) (emphasis added).

Despite the fact that both the Bertling–ACS and ACS–Qatar Contracts contain explicit provisions that require the cargo to be delivered at least 24 hours before the scheduled departure date, it is undisputed that "the first truck transporting the Subject Cargo arrived at IAH at or around 9:32 [AM] on May 3, 2022" and "[t]he remaining four trucks arrived in the course of the following hour." (*Id.* at 32). Accordingly, while the first truck was timely, it is undisputed that the entirety of the shipment was not delivered until *after* the 24-hour deadline. *See* (*id.* at 4) (noting that the scheduled departure time was 9:40 AM on May 4, 2022). After the delivery of the cargo, Worldwide Flight Services, Inc. ("WFS"),[1] a ground handling contractor for Qatar, began the security screening process. It is undisputed that the cargo failed to pass the screening process "when one part of it failed the Explosives Trace Detection (ETD) screening." (*Id.* at 24). Qatar contends that because the cargo was not cleared by TSA, Qatar "was prohibited by law from loading the Subject Cargo onto the aircraft." (*Id.*).

---

[1] Bertling also brought several claims against WFS in this lawsuit. After reviewing WFS's Motion for Summary Judgment (Doc. No. 53), this Court dismissed all claims against WFS on April 8th, 2025. (Doc. No. 76).

3

Bertling contends that after it "was informed that the cargo had failed security screening," a Project Manager at Bertling, Jon Mezo ("Mezo"), "spoke with a representative of Qatar who purported to speak on behalf of both Qatar and WFS." (*Id.* at 1) (Decl. of Jon Mezo). Bertling contends that this representative "stated that it would permit the cargo to be divided up, split onto new airway bills, and re-delivered to IAH airport by 7:00 pm on May 3, 2022." (*Id.*). After receiving these instructions, "Bertling arranged for the cargo to be retrieved from IAH airport for re-packaging" and then "re-delivered the cargo to IAH." (*Id.* at 2). Qatar, on the other hand, contends that while there was a call to discuss the screening results, Qatar and WFS employees specifically advised ACS "NOT to re-tender the cargo, as [they] were well past cut off and did not have the manpower to accept it." (Doc. No. 58-2 at 24) (internal email from Martha Arcizo of Qatar to several other Qatar employees on November 17, 2022).[2]

Regardless of which (if either) rendition is accurate, it is undisputed that when the second delivery arrived at IAH approximately at 7:00 PM, Qatar "did not at any time have staff present to perform the necessary screening of the cargo." (Doc. No. 50-2 at 45). Qatar contends that while "WFS was contracted to provide two screening staff . . . for cargo being carried by Qatar [] between the hours of 08:00 and 17:00 on Tuesdays," the staff had left the airport by the time of the second delivery. (*Id.*). Qatar maintains that it "made reasonable efforts to ask WFS to keep its screening staff at the facility, but Qatar [] does not have the authority to order or direct the assignment or work hours of WFS screening personnel." (*Id.*). Accordingly, there were no staff to complete the required security screening.

---

[2] The Court notes that this email was in response to several emailed questions about this dispute sent from another employee at Qatar. (*Id.*) (describing Bertling's allegations and asking Martha Arcizo if those allegations are correct). The email was sent on November 17, 2022, over six months after the series of event leading up to this lawsuit. (*Id.*)

4

Ultimately, it is also undisputed that the cargo did not make it on the scheduled flight and that Qatar did not refund ACS and/or Bertling for the charter price at $850,000.00. (*Id.* at 41). Based on this series of events, Bertling filed this lawsuit against Qatar for (1) breach of contract, (2) breach of oral contract, (3) negligent misrepresentation, and (4) negligence. (Doc. No. 11).[3] Bertling filed a Motion for Partial Summary Judgment, requesting this Court to find that Qatar breached the Qatar–ACS Contract, as a matter of law, when it failed to ship out the cargo and/or failed to issue a refund for the charter. (Doc. No. 50). The Court considers the Motion for Partial Summary Judgment below.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

---

[3] After this Motion for Partial Summary Judgment was filed, Qatar filed a Third-Party Complaint against ACS. (Doc. No. 79).

A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### III.　Analysis

Bertling requests this Court to find, as a matter of law, that Qatar breached the ACS–Qatar Contract when it failed to ship out the cargo and/or failed to issue a refund for the charter. (Doc. No. 50). In response, Qatar argues that because "Bertling [n]ever executed a contract with Qatar Airways," "no contract, written or otherwise, between Bertling and Qatar Airways exists." (Doc. No. 59-1 at 5). Qatar contends that even assuming, *arguendo*, that Bertling is able to assert rights under the ACS–Qatar Contract, "genuine issues of material fact [] exist as to whether Bertling fully performed its obligations under *any* contract at issue here, whether Qatar Airways breached its obligations under such a contract, and whether Bertling suffered any damages from Qatar Airways' alleged breach." (*Id.* at 6). It is well-established Texas law that "[t]he elements of a breach-of-contract action are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach." *Tamasy v. Lone Star College Sys.*, 635 S.W.3d 702, 708 (Tex. App.—Houston [14th] 2021, no pet.). The Court addresses these elements, in turn, below.

### A.　There is a valid contract between Qatar and Bertling.

The Court first considers whether a valid contract exists between Qatar and Bertling, or more specifically, whether Bertling has a right to enforce the ACS–Qatar Contract. Qatar contends

that because Bertling was not a signatory on the ACS–Qatar Contract, there is no valid contract between Bertling and Qatar, and thus, no possible breach of contract claim. Bertling, on the other hand, maintains that because ACS entered into the ACS–Qatar Contact as an *agent* of Bertling, under Texas law,[4] Bertling can enforce the contract as the principal. The Court finds that there is no genuine dispute of material fact that there was a principal-agent relationship between Bertling and ACS, and that accordingly, Bertling can enforce the ACS–Qatar Contract as the principal.

As a preliminary matter, "[t]he question of whether a principal-agent relationship exists under established facts is a question of law for the court." *First Nat. Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App.—Corpus Christi 2006, no pet.). "An agent is one who consents to the control of another, the principal, where the principal manifests consent that the agent shall act for the principal." *Id.* "A principal-agent relationship is not presumed, and the party asserting the relationship has the burden of proving it." *Id.* "The party claiming agency must prove the principal has both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the task." *Id.*

The Court finds that there is no genuine dispute of material fact that Bertling and ACS had a principal-agent relationship for this transaction. On April 26, 2022, Bertling entered into a written contract with ACS to ship the subject cargo. (Doc. No. 50-2 at 3). The Bertling–ACS Contract provided that "ACS shall make available to [Bertling] the Aircraft as specified in the Schedule below and [Bertling shall take the Aircraft on charter from ACS . . . ." (*Id.*). The Bertling–ACS Contract set out the following proposed schedule:

---

[4] The Parties agree that Texas law applies to this dispute. *See* (Doc. Nos. 50, 59-1).

7

| THE SCHEDULE: | | | |
| --- | --- | --- | --- |
| Aircraft type: Boeing B777-200F Gross payload: 100,000 Kilos or volumetric equivalent. | | | |
| Departure date/time (utc) | From | To | Arrival date/time (utc) |
| 4th May 2022 / 14:40 | Houston (IAH), USA | Liege (LGG), Belgium | 4th May 2022 / 23:50 |
| 5th May 2022 / 02:10 | Liege (LGG), Belgium | Doha (DOH), Qatar | 5th May 2022 / 08:15 |
| 5th May 2022 / 22:00 | Doha (DOH), Qatar | Changi (SIN), Singapore | 5th May 2022 / 05:40+1 |
| With technical (refueling) stop(s) at DOH and/or other airport(s)  Full schedule to be confirmed. SUBJECT TO SLOTS, TRAFFIC RIGHTS AND AIRCRAFT PARKING | | | |

(*Id.*). Bertling agreed to pay ACS the "Charter Price" in exchange for ACS to agree to act as "an intermediary between [Bertling] and [Qatar] in connection with the provision of the Aircraft for any flight." (*Id.* at 5) (§ 3.1).

On the same day that the Bertling–ACS Contract was executed, ACS entered into a written contract with Qatar. (*Id.* at 13) (listing the Effective Date as April 26, 2022). The ACS–Qatar Contract provided the exact same flight schedule as the Bertling–ACS Contract:

| 3 | Aircraft | Boeing 777 Freighter, Registration Marks: A7- BFG | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 4 | Programme | The Flights in accordance with the schedule of flights specified below (all times in UTC): | | | | | | |
| | | N° | DATE | FLIGHT N° | FROM | TO | DEP. TIME | ARRIVAL TIME |
| | | 1 | 04-May-2022 | QR8186 | IAH | LGG | 14:40 | 23:50 |
| | | 2 | 05-May-2022 | QR8186 | LGG | DOH | 02:10 | 08:15 |
| | | 3 | 05-May-2022 | QR8064 | DOH | SIN | 22:00 | 05:40 +1 |

(*Id.*). The ACS–Qatar Contract specifically provided that "[ACS] agrees that it enters into the Contract both as principal on its own behalf and *as agent for all persons and owners of the goods and cargo* carried under the Charter, *each of whom shall be bound by these conditions*." (*Id.* at 20) (§ 17.3) (emphasis added). It is undisputed that Bertling owned the subject cargo. *See* (Doc. Nos. 50, 59-1).

While Qatar argues that "[n]othing in the ACS–Qatar Contract identifies Bertling, or [identified] that ACS was operating as the agent for any principal, including Bertling," (Doc. No. 59-1 at 5), the summary judgment evidence establishes otherwise. The Bertling–ACS Contract shows that Bertling hired ACS to act as the "intermediary," or as an agent, to book the necessary

8

transportation services to ship the cargo. On the same day that Bertling hired ACS for this project, ACS entered into an agreement with Qatar "as *agent* for all persons and owners of the goods and cargo" for the transportation of the cargo. The Court finds that Bertling established that there is no genuine dispute of material fact that ACS entered the ACS–Qatar Contract in its capacity as an agent.

Having established that a principal-agent relationship existed between Bertling and ACS for the purposes of this transaction, the Court next addresses whether Bertling has the right to enforce the ACS–Qatar Contract as the principal. Under Texas law, "[a]n agent need not disclose his or her principal's identity in order to act on behalf of that principal." *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003). "An agent may make a contract for an undisclosed principal in his own name, and the latter may sue or be sued on the contract." *Bishop*, 187 S.W.3d at 714–715. In other words, "[a] principal—whether disclosed or not—may sue on a contract made by its agent." *CHU de Quebec-Universite Laval v. Dreamscape Dev. Grp. Holdings, Inc.*, No. 4:21-CV-182, 2026 WL 1091594, at *9–10 (E.D. Tex. Apr. 22, 2026) (relying on *Latch*, 107 S.W.3d at 546).

Here, Bertling, as the principal, "is a party to, and may sue on," the ACS–Qatar Contract because ACS entered into that contract as Bertling's agent. *See CHU de Quebec-Universite Laval*, 2026 WL 1091594, at *9–10. Though Qatar contends that Bertling cannot enforce the ACS–Qatar Contract because it "is not a signatory" and "has put forth no evidence establishing that it has a right to enforce . . . as the principal of ACS," the Court disagrees. As described above, the summary judgment evidence establishes that Bertling contracted with ACS to act as its agent to book the necessary transportation to transport the cargo, and ACS contracted with Qatar "as agent" for Bertling to transport that cargo. (Doc. No. 50-2 at 3–20). Accordingly, the Court finds that there is no genuine dispute of material fact that Bertling can enforce the ACS–Qatar Contract. The Court

9

**GRANTS** Bertling's Motion for Partial Summary Judgment (Doc. No. 50) as to the first element of the breach of contract claim.

## B. There is a genuine dispute of material fact as to the remaining elements.

Bertling requests this Court to find that there is no genuine dispute of material fact as to the remaining elements of the breach of contract claim: "(2) performance or tendered performance by the plaintiff, (3) breach of contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach." *Tamasy*, 635 S.W.3d at 708. The Court finds that while the summary judgment evidence establishes that there is no genuine dispute of material fact that Bertling can enforce the ACS–Qatar Contract against Qatar, there is a genuine dispute of material fact as to breach and performance. The Court addresses these issues below.

### 1. Performance

First, the Court finds that there is a genuine dispute of material fact as to whether Bertling performed under the ACS–Qatar Contract as to (1) the timeliness of the delivery and (2) the quality of the packaging. The ACS–Qatar Contract clearly required the "Cargo [to] be ready loading twenty-four (24) hours before scheduled time of departure" and that the cargo "shall comply with all customs and all other formalities, applicable laws, and regulations." (Doc. No. 50-2 at 13, 18). While Bertling argues that it performed under the Contract because "the first truck transporting the Cargo to IAH arrived" before the 24-hour deadline, (Doc. No. 50 at 15), Qatar provided summary judgment evidence that demonstrates that the last four of the five total trucks with the cargo arrived *after* the 24-hour deadline. (Doc. No. 50-2 at 32). The Court finds that there is a genuine dispute of material fact as to whether Bertling performed its obligation to deliver the cargo by the required deadline.

10

The Court also finds that there is a genuine dispute of material fact as to whether the cargo arrived in compliance with the ACS–Qatar Contract. Qatar provided summary judgment evidence that when the first shipment arrived, Bertling was missing necessary documents for the security screening, and that on top of the delayed arrival of the cargo, the missing documents delayed the process even further. *See* (Doc. No. 59-2 at 51). Nevertheless, Qatar accepted the cargo and began the screening process, but part of the shipment "failed the Explosives Trace Detection (ETD) screening." (Doc. No. 50-2 at 24). At that point, Qatar contends that Bertling failed to perform under the terms of the ACS–Qatar Contract because the shipment was late and failed the screening. Bertling provided summary judgment evidence, on the other hand, that demonstrates that Qatar "stated that it would permit the cargo to be divided up, split onto new airway bills, and re-delivered to IAH airport by 7:00 pm on May 3, 2022" and still make it on the flight the following morning. (*Id.* at 1). Bertling argues that the re-delivery was full performance under the Contract.[5]

The Court finds that while this analysis is not exhaustive of the various fact issues that pervade this case and this specific element, a genuine dispute of material fact exists as to whether Bertling performed its obligations under the ACS–Qatar Contract.

### 2. Breach

The Court also finds that there is a genuine dispute of material fact as to whether Qatar breached the ACS–Qatar Contract when it failed to deliver the cargo and/or failed to refund ACS/Bertling for the Charter Price.

---

[5] The Court notes, however, that the ACS–Qatar Contract explicitly states that "No addition to, or variation of, these Conditions shall bind Qatar Airways unless contained in the Contract or otherwise agreed in writing between the Parties after the execution of the Contract." (Doc. No. 50-2 at 15) (§ 1.2). While Bertling contends that it performed on the modification of the Contract (*i.e.*, the re-delivery of the cargo), it did not present any evidence that this modification was in writing.

Bertling contends that Qatar breached the Contract when it failed to conduct screening on the second delivery. After Qatar purportedly "stated that it would permit the cargo to be divided up, split onto new airway bills, and re-delivered to IAH airport by 7:00 pm on May 3, 2022," (*id.* at 1), Bertling successfully re-delivered the cargo by the deadline. When the cargo arrived for the second time, however, Qatar "did not at any time have staff present to perform the necessary screening of the cargo." (*Id.* at 45). Bertling argues that the failure to have the staff present for the screening was a breach of contract. On the other hand, Qatar sets out a different series of events. Qatar provided summary judgment evidence that Qatar and WFS employees specifically advised ACS "NOT to re-tender the cargo, as [they] were well past cut off and did not have the manpower to accept it" and that "[i]t was discussed that . . . [Qatar] would unfortunately reject the return (which WAS communicated to the customer via phone call)." (Doc. No. 58-2 at 24, 51). The Court finds that there is a genuine dispute of material fact as to whether Qatar breached its duty by failing to screen the re-delivery of the shipment.

Bertling also argues that, at the very least, Qatar breached the Contract because it failed to refund the Charter Price. The Contract states:

> If due to refusal, cancellation, or late granting of any authorisation, clearance, or permit required for the performance of the Programme, ***or for unforeseen Aircraft failures, crew limitations, safety or security concerns***, or if due to any other cause beyond the control of Qatar Airways, ***Qatar Airways is unable within a reasonable time to perform the Programme, then Qatar Airways may, at its absolute discretion, but without obligation, immediately suspend or terminate the Contract*** upon notice to the Charterer. ***In the event of termination or suspension of the Contract in accordance with the foregoing***, no penalty shall be due or payable by either Party and ***both Parties will be absolved of all liabilities for any and all losses suffered therefrom and any payments of deposits or Charter Price made by or on behalf of the Charterer to Qatar Airways will be refunded to the Charterer*** within a reasonable period of time . . . .

(Doc. No. 50-2 at 17) (§ 7.1) (emphasis added). Bertling argues that the cargo was delayed because of "crew limitations" and/or "security concerns," and accordingly, Qatar was required to refund

the Charter Price. The plain text of the Contract, however, clearly states that even if "Qatar Airways is unable within a reasonable time to perform the Programme" due to "crew limitations [or] safety or security concerns," Qatar had "absolute discretion" and was "without obligation" to "immediately suspend or terminate the Contract." (*Id.*). The Contract then provides that "[i]n the event of termination or suspension," then "any payments of deposits or Charter Price made by or on behalf of the Charterer to Qatar Airways will be refunded." (*Id.*). While Bertling reads this provision to mean the failure to perform required Qatar to refund the Charter Price, the plain text of the Contract states that Qatar is only required to refund the Charter Price if and only if Qatar (in its absolute discretion) decided to suspend or terminate the Contract. (*Id.*). Qatar did not choose to suspend or terminate the Contract, and accordingly, under this specific provision, Qatar has no contractual obligation to refund the Charter Price.

The Court finds that while the argument that Qatar breached the specific provision of the Contract by failing to issue the refund fails for the reasons set forth above, there is still a genuine dispute of material fact as to whether Qatar breached the Contract by failing to screen the re-delivery of the cargo and then transport the cargo. Ultimately, however, the Court notes that a finding that Qatar breached the ACS–Qatar Contract could result in a refund or damages covering the amounts paid by Bertling. The Court finds that the genuine disputes of material fact that pervade the performance and breach elements of the breach of contract claim require this Court to **DENY** the Motion for Partial Summary Judgment (Doc. No. 50) on the remaining elements of the breach of contract claim.

## IV.    Conclusion

For the foregoing reasons, the Court hereby **GRANTS-IN-PART AND DENIES-IN-PART** Bertling's Motion for Partial Summary Judgment (Doc. No. 50). The Court finds that there

is no genuine dispute of material fact that Bertling has the right to enforce the ACS–Qatar Contract as a principal. Accordingly, the Court finds, as a matter of law, the first element of Bertling's breach of contract claim against Qatar is satisfied. The Court, however, finds that genuine disputes of material facts exist as to the remaining elements of the breach of contract claim. The remaining three elements of the breach of contract claim, performance or tendered performance by the plaintiff, breach of contract by the defendant, and damages sustained by the plaintiff as a result of the breach, are still at issue in this case.

It is so ordered.

Signed on this the ___30___ day of July 2026.

Andrew S. Hanen
United States District Judge

14